IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | NO.:  2:16-CR-010-RWS-JCF |
| | : | |
| CARLOS SANCHEZ | : | |

## REPORT AND RECOMMENDATION

This matter is before the undersigned on Defendant Sanchez's Motion To
Suppress Evidence And Motion In Limine (Doc. 80) and Motion To Suppress
Statements (Doc. 88).[1]  For the reasons discussed below, it is **RECOMMENDED**
that Defendant's motions be **GRANTED in part and DENIED in part**.

## Background

Defendant Sanchez and others are charged in a 12-count Indictment with
drug-related offenses, including conspiracy.  (Doc. 1).  Defendant filed a motion to
suppress evidence seized by law enforcement officers without a warrant on
February 17, 2016 (Doc. 80) and a motion to suppress any statements Defendant
made following his February 17th arrest (Doc. 88).  Defendant argued that the
February 17th search violated his Fourth Amendment rights because he did not

---

[1] The undersigned previously deferred Defendant's motion to suppress statements
to the District Judge (*see* Doc. 251), but evidence relevant to that motion was
presented during the January 26, 2018 hearing and the parties have discussed in
their briefs the issue of whether his statements should be suppressed.  The
undersigned has therefore considered Defendant's motion to suppress statements
and makes the recommendation that it be granted for the reasons discussed below.

consent to the search and there was no probable cause to support the search. (*See* Doc. 80). He filed a supplemental brief in support of his motions on January 5, 2018 (Doc. 286) in which he argued that even though he was on parole at the time of the search, there was no arrest warrant or revocation petition to support the search, he "had not waived his 4th amendment right as a condition of parole," and reasonable suspicion did not support the search (*id.* at 3-4). The Court conducted a hearing on Defendant's motions on January 26, 2018 (*see* Doc. 291), and the transcript of that hearing was filed on February 13, 2018 (Doc. 294).[2] The Government filed a post-hearing brief on March 19, 2018 (Doc. 301), and Defendant filed his post-hearing brief on April 4, 2018 (Doc. 306).

Following the January 26, 2018 hearing, the Government submitted a brief in which it argued that the February 17, 2016 search of Defendant's car and cellphones were authorized by the parole search condition; even if reasonable suspicion were required to search, it existed; Defendant was lawfully under arrest when he provided iPhone passcodes and voluntarily provided them; and Defendant's disclosure of his nickname to GBI agents after he was arrested on the state arrest warrant was part of a routine booking procedure and therefore admissible, even though Defendant had asserted his *Miranda* rights. (Doc. 301). Defendant then filed a reply brief (Doc. 306) in which he asserts that he did not

---

[2] References to the transcript of the hearing are designated as "Tr. __."

lose the protection of the Fifth Amendment's rights against self-incrimination by virtue of his status as a parolee and therefore his Fifth Amendment rights were violated when he was required to provide his iPhone passcodes and then arrested for failing to do so.  (*See id.* 306 at 7-9).

In an Order entered May 9, 2018 (Doc. 311), the undersigned found that Defendant's discussion of the Fifth Amendment self-incrimination issue was "somewhat conclusory, not particularly well-developed, and made in his reply brief," and required the parties "to submit additional briefing on whether the requirement that Defendant provide his iPhone passcodes violated his Fifth Amendment right against self-incrimination and if so, what evidence, if any, should be suppressed as a result of that violation." (*Id.* at 9).  Defendant then filed a brief (Doc. 316), and the Government responded (Doc. 322).  With briefing on Defendant's motions complete, the undersigned now considers their merits.

### Facts[3]

In early 2016 FBI Special Agent Joe Thompson was the case agent on an investigation using wiretap surveillance with the primary target being Defendant Horace Mayfield.  (Tr. 60-61).  On January 16, 2016, agents heard Mayfield

---

[3] These facts are taken from the hearing testimony of Andrew Jerram, a Criminal Investigator with the Georgia Department of Community Supervision, Joseph Thompson, a Special Agent with the Federal Bureau of Investigation (FBI), and Jamie Abercrombie, a Special Agent with the Georgia Bureau of Investigation (GBI) (*see* Doc. 294) as well as exhibits presented during the hearing (*see* Docs. 297, 298).

talking to a person about the price and quantity of methamphetamine Mayfield was going to pick up. (Tr. 61). Although the agents did not know at that time the identity of the person Mayfield was talking to, they knew the person's phone number. (Tr. 61-62). Thompson now believes that the person with whom Mayfield was speaking was Defendant Sanchez, but he and the other agents did not then know that person's identity. (Tr. 62-63). The unidentified person told Mayfield that another person (later identified as Gustav Melendez) would call him and give him an address where Mayfield was going to pick up methamphetamine. (Tr. 62-63). Melendez called Mayfield and gave him an address for a Target store at 2400 North Druid Hills in Atlanta. (Tr. 63-64). Mayfield also asked Melendez, "is this Cholo," and Melendez responded, "no, this is 'G,' Cholo's cousin." (Tr. 73). Melendez also told Mayfield that he was in Cholo's BMW, that it was his now, and Mayfield asked if Cholo had been fired. (Tr. 73). Melendez told him "no . . . [Cholo] had just gotten too busy and that [Meledez] had taken over . . . some of his business." (Tr. 73). Agents did not then know the identity of Cholo. (Tr. 73, 75). Agents then conducted surveillance at the Target store on January 16th, and Mayfield arrived in a BMW driven by a woman. (Tr. 64). Melendez, who was carrying a package close to his body, got into the car with Mayfield, but when Melendez exited the vehicle he was not carrying the package. (Tr. 64-65). Agents continued conducting surveillance on Melendez after January 16th and saw

4

him in an Audi A6 which was registered to an address at 317 Ard Place in Atlanta. (Tr. 65).

The next day, January 17th, Mayfield communicated with another individual[4] via text, and that person asked Mayfield if he had talked to "Droop" and asked Mayfield for Droop's number.  (Tr. 74).  Mayfield told the person he had spoken with Droop the day before and provided the same phone number as the phone number of the unidentified person Mayfield had initially spoken with the day before to discuss the price and quantity of the methamphetamine he was going to pick up.  (Tr. 74).  Agent Thompson now believes that number was Defendant Sanchez's, but the agents did not know that at the time, nor did they know the identity of "Droop."  (Tr. 74-75).

On January 30th the agents were following Mayfield, who traveled to the same Target store where he met Melendez on the 16th.  (Tr. 66).  Melendez once again entered Mayfield's vehicle and then left the location.  (Tr. 66).  Agents followed Melendez to nearby Druid Valley Apartments but were unable to determine to which specific apartment Melendez went.  (Tr. 66).  Agents later identified an apartment they believed Melendez was using and obtained a search warrant for that address, 1531 Druid Valley Drive, Apartment B, Atlanta, Georgia. (Tr. 67; *see also* Gov't Exs. 1a, 1b, 1c).

---

[4] At the hearing Agent Thompson could not identify the person with whom Mayfield was communicating.  (Tr. 84).

February 17, 2016 was designated as the "takedown day" for the wiretap investigation, i.e., the day when search warrants would be executed and targets arrested.  (Tr. 68).  On that day, Andrew Jerram was employed as a Community Supervision Officer with the Georgia Department of Community Supervision, which serves probation and parole officers across the state, and he is also assigned as a Task Force Officer with the FBI Safe Streets Gang Task Force.  (Tr. 10-12).  In 2015 the probation field supervision functions of the Department of Corrections were merged with the parole supervision functions of the State Board of Pardons and Paroles to create the Department of Community Supervision, and former parole officers (now called Community Supervision Officers) such as Jerram retained the powers and authority of a parole officer to supervise parolees and probationers.  (Tr. 10-12, 39-41).

Officer Jerram performed perimeter security during the February 17th execution of the search warrant at 1531 Druid Valley Drive.  (Tr. 12-13, 15-16, 67-68).  He was accompanied by FBI Special Agents Larry Gera and Greg Donovan.  (Tr. 13).  No one was present in the apartment when agents made entry that day.  (Tr. 68).  The agents observed cash, a large quantity of methamphetamine, scales, containers with methamphetamine residue, an electronic money counter, firearms, and papers in the apartment.  (Tr. 14-16, 69; Gov't Exs. 2a through 2g).  One of the papers they discovered was a letter addressed to Melendez at 317 Ard Place in

6

Atlanta, which appears to bear his signature.  (Tr. 14-16, 70-71; Gov't Ex. 2g).
Once Agent Thompson saw the letter with the Ard Place address, he decided to
send some agents there to set up surveillance.  (Tr. 72).  Jerram, Donovan, and
Agent Prince went to that address to watch it until other agents could go there to
talk to the residents.  (Tr. 14-15).  They arrived at 10:49 a.m.  (Tr. 41, 54-55).

While they were watching the Ard Place address, a single family residence,
the agents observed a white Lexus sedan pull up and park on the street at 11:05
a.m.  (Tr. 15-17, 41, 55).  Defendant exited the vehicle and began talking to
someone who had come out of the residence, later identified as Wilfredo Otero.
(Tr. 17, 42-44).  A couple of minutes later it appeared that the men were going to
leave, so Agent Donovan said that the agents should talk to the men to find out
who they are.   (Tr. 17, 55).  Jerram and Donovan exited their vehicles and
approached the men, who were near the white sedan and the mailbox in the front
yard of the house.  (Tr. 18).  Jerram was dressed in khaki cargo pants, wearing his
soft armor carrier which houses his bulletproof vest and identified him as a DCS
officer, his weapon holstered on his side, and his badge.  (Tr. 18-19).  Agent
Donovan wore an olive drab armor carrier that identified him as an FBI agent and a
holstered weapon.  (Tr. 19).  Neither agents drew their weapon.  (Tr. 19).

The agents told the men that Agent Donovan was with the FBI and Officer
Jerram was with the Department of Community Supervision, they explained that

they were doing an investigation, and they asked the men if they would talk with the agents, and the men agreed. (Tr. 20, 44-45). The agents spoke with the men in a conversational tone. (Tr. 20). Jerram asked them if they were on probation or parole, and Defendant said that he was on parole. (Tr. 21, 46). As a parole officer, Jerram knew that Defendant was required to abide by certain parole conditions, and he knew that he could access information about Defendant on his state-issued computer. (Tr. 21). Jerram asked him for his complete name and his Georgia Department of Corrections (GDC) number, which he provided along with his parole officer's name. (Tr. 21). Defendant was not free to leave once he identified himself as a parolee. (Tr. 48).

Defendant's status as a parolee was reflected in standard documents which were the subject of testimony at the hearing. Once the Parole Board decides to parole an inmate, a Parole Certificate, which contains both specific and standard conditions of parole, is generated and maintained in a computer system. (Tr. 23-25). The inmate is required to sign the certificate in order to be released from prison. (Tr. 24). The inmate is then required to meet with a parole officer, who goes over the Parole Certificate again and has the parolee sign the form again. (Tr. 24-25). Defendant's Parole Certificate indicates that he was paroled in January 2015 with a parole expiration date of April 8, 2017, and his standard conditions include, among other conditions, "I will truthfully answer all questions and follow

all written and verbal instructions from my parole officer or any other employee of the State Board of Pardons and Paroles" and "My parole officer or any other parole officer may, at any time, conduct a warrantless search of my person, papers, and place of residence, automobile, or any other property under my control."  (Gov't Ex. 17).   Defendant signed the certificate acknowledging those conditions and indicating that he understood them and agreed to comply with them.  (*Id.*).  Jerram knew that those conditions are standard for all parolees in Georgia and that they applied to Defendant as a parolee.  (Tr. 30).

Jerram made two observations that "caught [his] attention."  (Tr. 30).  First, Defendant had not been out of prison very long but "was driving a very, very new luxury style vehicle."   (Tr. 30-31).   In addition, Jerram observed "multiple cellphones that were visible" in the front passenger seat, "including some that had small numbers taped to the back of them."  (Tr. 31, 47).  In Jerram's experience, having multiple phones indicates that the phones were "burner" or "drop" phones used by persons involved in drug trafficking to communicate with customers or suppliers.  (Tr. 31-32).  Those observations coupled with the fact that they were conducting a narcotics investigation led Jerram to believe that Defendant "may be involved in narcotics trafficking."  (Tr. 31).  Jerram asked Defendant why he had so many phones, and he told Jerram that he worked at a Cricket Wireless store. (Tr. 47).

Jerram reminded Defendant that he was a parole officer and told him he was going to do a parole search of his vehicle and asked if he had anything Jerram needed to know about for officer safety purposes. (Tr. 32). Defendant said he did not have anything and he did not raise any objections. (Tr. 32). Jerram searched the car at 11:15 a.m., which was roughly 8 minutes after he initially approached Defendant, and other than the phones, he did not find anything consistent with drug trafficking. (Tr. 32-33, 55). Defendant was not handcuffed or restrained at that point. (Tr. 50, 55). Jerram wanted to search Sanchez's phones "for any digital evidence of parole violation," and he believed he could search them pursuant to Sanchez's parole conditions. (Tr. 33). He was able to access some of the phones, the Cricket phones, without passcodes, but two of the phones were iPhones and passcode-protected. (Tr. 33, 50). He asked Sanchez for the passcodes for the iPhones, but Defendant refused to provide them, stating, "I'm not going to give you the passcode." (Tr. 33-34, 50). Jerram explained to him that "failure to follow instructions from a parole officer could result in his arrest . . . for a violation of parole," and Sanchez again stated, "I'm not going to give you the passcode." (Tr. 34, 50, 56). Jerram then placed Defendant in handcuffs and requested a parole warrant for Defendant's arrest. (Tr. 34, 51, 56). Jerram stopped questioning Defendant at that point. (Tr. 52). Jerram contacted Field Operations Officer Alan Smith and "let him know what was going on," including his observations that

10

made him suspicious, his search of the car, and Defendant's refusal to provide the passwords for the phones.  (Tr. 35-36).  Smith then prepared a parole warrant, obtained a parole board member's signature on the warrant, and let Jerram know that it had been signed.  (Tr. 35-36).  Jerram received the parole warrant at 11:21; the process of obtaining it took "two minutes at the most."  (Tr. 36, 56).  Jerram told Defendant that a parole warrant had been issued for his arrest based on his failure to follow instructions from a parole office and searched him to make sure he did not have any weapons, a handcuff key, or contraband around his waistband and did not find any.  (Tr. 34, 36-37).  The agents had Defendant sit on the curb near his car.  (Tr. 34).  Jerram did not advise Defendant of his *Miranda* rights at any point during their encounter.  (Tr. 48).

At 11:45 a.m. Defendant said, "I'll give you the passcode," and Jerram said, "okay, what's the passcode."  (Tr. 37, 57).  Jerram had not told Defendant that if he provided the passcode Jerram would cancel the warrant.  (Tr. 37).  Defendant provided the passcodes and Jerram wrote them down and also entered them in the phones, which unlocked them.  (Tr. 38).  Jerram did a "cursory review" of recent text messages and images, "the areas where criminal conversations most tend to be [on a] phone," and he saw an image file with instructions on how to set up a "trap house," i.e., a place where drugs are distributed.  (Tr. 38-39).  That observation made Jerram "believe that this is something that the case agent should probably get

11

a federal search warrant so that they can do a complete extraction on the phone." (Tr. 39).

Agent Thompson arrived at the scene, possibly around noon, and saw Defendant in handcuffs; he was told that Defendant had been taken into custody on a parole warrant. (Tr. 75). At some point Jerram showed him something on one of the iPhones, some texts relevant to drug activity and a phone number listed as Defendant's work number. (Tr. 76). That number, (404) 632-5012, was the same number as the number of the person Mayfield spoke with on January 16th about the price and quantity of methamphetamine and that Mayfield had identified as "Droop's" number in his January 17th text. (Tr. 76-77). Thompson also looked at his "linesheets" for the wiretap conversations and saw that that phone number was the number of the person Mayfield spoke with on January 16th. (Tr. 79). Thompson then called GBI Special Agent Clay Bridges to give him that information, and Bridges said that they would get a state arrest warrant for Defendant's arrest for the drug conspiracy they were investigating. (Tr. 79-80). Otero and Defendant were taken into GBI custody and transported to the GBI command center in Toccoa in Stephens County to be interviewed by the GBI. (Tr. 80, 89-93, 99).

GBI Special Agent Jamie Abercrombie was assigned to the GBI command post on February 17, 2016 to assist with interviews and other operations. (Tr. 89-

12

91).   She also prepared and obtained arrest warrants from a Stephens County Superior Court Judge for Defendant and other individuals.   (Tr. 91-92, 99-100; Gov't Ex. 7).   After Defendant was transported to the command post, Agents Bridges and Abercrombie met with Defendant to interview him.[5]   (Tr. 93).   Agent Bridges asked Defendant identification questions to complete the top part of the waiver of rights form, and Abercrombie asked Defendant a couple of questions about identifying information that was needed to complete the Arrest Record form but that was not on the *Miranda* form, including his nickname, which he identified as "Droopy."   (Tr. 95-98, 102-03; Gov't Exs. 10, 11, 12).   After Bridges finished reading Defendant his rights, Defendant exercised his right to remain silent and for an attorney, so an interview was not conducted.   (Tr. 95, 97, 102; Gov't Exs. 11, 12).   Abercrombie then asked Defendant additional biographical information to complete the Arrest Record form, which Defendant signed.    (Tr. 96; Gov't Exs. 10, 12).   Agent Abercrombie had been briefed on the wiretap investigation, but she had not participated in the investigation and she did not know Defendant or know of any nicknames he used or the significance of any nicknames he used.  (Tr. 90-92).   Defendant was then transported to the Stephens County Jail.  (Tr. 101, 103).

---

[5] The agents' conversation with Defendant was recorded.  (Tr. 93; Gov't Ex. 12).

## Discussion

Defendant contends that evidence seized as a result of the warrantless search of his vehicle and cellphones should be suppressed because it was obtained in violation of the Fourth Amendment and that his statements about his iPhone passcodes, evidence found on his iPhones, and his post-arrest statements about his nickname should be suppressed because that evidence was obtained in violation of the Fifth Amendment. (*See* Docs. 80, 88, 286, 306, 316).

## I.   Fourth Amendment

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."   U.S. Const. amend. IV.   "Because the '[t]ouchstone of the Fourth Amendment is reasonableness, . . . the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' "   *United States v. Boynton*, 337 Fed. Appx. 801, 803 (11th Cir. 2009) (unpublished opinion) (quoting *United States v. Knights*, 534 U.S. 112, 118-19 (2001) (internal quotation omitted)). Where a seizure is made without a warrant the burden is on the government to "demonstrate that the challenged action falls within one of the recognized exceptions to the warrant

14

requirement, thereby rendering it reasonable within the meaning of the fourth amendment." *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983).

The undersigned finds that the Government has demonstrated that the warrantless search of Defendant's car and cellphones falls within a recognized exception to the warrant requirement, i.e. Defendant's parole condition allowing such searches. Defendant's standard conditions of his parole, to which he agreed, provide in relevant part, "My parole officer or any other parole officer may, at any time, conduct a warrantless search of my person, papers, and place of residence, automobile, or any other property under my control." (Gov't Ex. 17). In *Samson v. California*, 547 U.S. 843, 847 (2006), the Supreme Court considered "whether a condition of release can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment" and answered that question in the affirmative. The Court explained "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." *Id.* at 850. "Applying *Samson*, the Eleventh Circuit held in *United States v. Stewart*, 213 F. App'x 898, 899 (11th Cir. 2007), that, given the State of Georgia's substantial interest in supervising parolees in order to reduce recidivism and promote reintegration, and given the significantly diminished expectation of privacy of a parolee released subject to a condition permitting suspicionless

searches, no level of suspicion is required under the Fourth Amendment to conduct a search of a parolee's person or residence." *United States v. Wade*, No. 1:11-CR-0337-WBH, 2012 U.S. Dist. LEXIS 11561, at *11 (N.D. Ga. Jan. 4, 2012), *adopted by* 2012 U.S. Dist. LEXIS 1152 (N.D. Ga. Jan. 31, 2012).  Thus, neither a warrant nor reasonable suspicion were required for Officer Jerram to search Defendant's car and cellphones.  Accordingly, to the extent that Defendant moves to suppress evidence obtained as a result of the search of his car and cellphones based on alleged violations of the Fourth Amendment, it is **RECOMMENDED** that motion be **DENIED**.

## II.    Fifth Amendment

"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V.  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  *Id*. at 444.  Specifically, before a person in custody is interrogated, he must be advised that he has the right to remain silent; that anything he says can and will be used against him in court; that he has the right to consult with a lawyer and to have the lawyer with him during interrogation; and that if he cannot afford a lawyer, a lawyer will be appointed to

represent him. *Id.* at 467-73. "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444.

Regardless of whether *Miranda* warnings are required, "the court must still rule on the confession's voluntariness." *Jarrell v. Balkcom*, 735 F.2d 1242, 1252 (11th Cir. 1984). A statement is not given voluntarily if it is "extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper influence." *Harris v. Dugger*, 874 F.2d 756, 761 (11th Cir. 1989). "The determination of whether a confession is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's free and rational choice." *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994) (citations omitted); *see also Arizona v. Fulminante*, 499 U.S. 279, 285-88 (1991) (noting that voluntariness is determined by the totality of the circumstances). "The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary." *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

### A. Search Of Passcode-Protected Cellphones

Defendant also argues that he was compelled to give Officer Jerram his iPhone passcodes in violation of his Fifth Amendment right against self-

incrimination.  (Doc. 306 at 7-9; Doc. 316 at 5-9).  "An individual must show three things to fall within the ambit of the Fifth Amendment: (1) compulsion, (2) a testimonial communication or act, and (3) incrimination."  *United States v. Doe (In re Grand Jury Subpoena Duces Tecum)*, 670 F.3d 1335, 1341 (11th Cir. 2012). The record shows that Defendant only gave Officer Jerram the iPhone passcodes after he repeatedly refused to do so, Jerram threatened him with arrest for a parole violation if he failed to do so, and he then arrested Defendant for his refusal.  It is true that, as the Eleventh Circuit has indicated, the failure to answer a parole officer's inquiries can justify revocation of parole, and because Defendant's parole conditions required him to required him to "truthfully answer all questions and follow all written and verbal instructions from my parole officer or any other employee of the State Board of Pardons and Paroles" (Doc. 297-21 at 5), Officer Jerram was authorized to arrest Defendant on a parole violation warrant when Defendant refused to comply with his instructions.  *See United States v. Robinson*, 893 F.2d 1244, 1245 (11th Cir. 1990) ("While a probationer has a Fifth Amendment right to avoid self-incrimination, this does not mean that the 'Federal Constitution would prevent a State from revoking probation for a refusal to answer that violated an express condition of probation or from using the probationer's silence as "one of a number of factors to be considered by the finder of fact" in deciding whether other conditions of probation have been violated.' " (quoting

*Minnesota v. Murphy*, 465 U.S. 420, 435 n.7 (1984)). But persuasive authority supports Defendant's contention that under the circumstances of this case, the compelled production of his iPhone passcodes violated his Fifth Amendment right against self-incrimination.

In the first place, although sparse, case law indicates that production of cellphone passwords constitutes incriminatory testimony protected by the Fifth Amendment.[6] *See, e.g.*, *In re Grand Jury*, 670 F.3d at 1346 (holding that Doe's "decryption and production of the contents of the hard drives would sufficiently implicate the Fifth Amendment privilege" because the "decryption and production would be tantamount to testimony by Doe of his knowledge of the existence and location of potentially incriminating files; of his possession, control, and access to the encrypted portions of the drives; and of his capability to decrypt the files"); *SEC Civil Action v. Huang*, No. 15-269, 2015 U.S. Dist. LEXIS 127853, at *3-11 (E.D. Pa. Sept. 23, 2015) (finding the defendants could invoke their Fifth Amendment right against self-incrimination to challenge production of their smartphone passcodes because production of passcodes was testimonial in nature); *United States v. Kirschner*, 823 F. Supp. 2d 665, 669 (E.D. Mich. Mar. 30, 2010) (quashing subpoena for testimony about computer password on Fifth Amendment

---

[6] *See State v. Trant*, No. 15-2389, 2015 Me. Super. LEXIS 272, at *5 and n.2 (Me. Sup. Ct. Oct. 27, 2015) (noting that "despite the ubiquitous presence of cellphones today, only a few reported cases address Fifth Amendment concerns with respect to cellphone passwords").

grounds because the government sought to require the defendant "to divulge through his mental processes his password – that will be used to incriminate him"); *State v. Trant*, No. 15-2389, 2015 Me. Super. LEXIS 272, at *11 (Me. Sup. Ct. Oct. 27, 2015) (finding that "compelling Defendant to divulge the contents of his mind – either by compelling him to surrender the passcodes or compelling him to himself open the phones – would violate his privilege against self-incrimination protected by the Federal and Maine Constitutions"); *Commonwealth v. Baust*, 89 Va. Cir. 267, 271 (Va. Cir. Ct. 2014) (finding that the defendant could not be compelled to provide access to his smartphone through his passcode because "compelling Defendant to provide access through his passcode is both compelled and testimonial and therefore protected" by the Fifth Amendment, but he could be compelled to produce his fingerprint to provide access because it was more akin to a key which "does not require the witness to divulge anything through his mental processes").

In addition, the facts in this case show that Defendant's production of his cellphone passcode was compulsory within the meaning of the Fifth Amendment. In *Minnesota v. Murphy*, 465 U.S. 420 (1984), the Supreme Court explained that a defendant does not lose the protection of the Fifth Amendment's provision that "no person 'shall be compelled in any criminal case to be a witness against himself' " even if he has been convicted of a crime. *Id.* at 426. "[N]otwithstanding that a

defendant is imprisoned or on probation at the time he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted." *Id.* The Court observed that the defendant's probation condition that he "appear and answer questions truthfully did not in itself convert Murphy's otherwise voluntary statement into compelled ones" because "[i]n that respect, Murphy was in no better position than the ordinary witness at a trial or before a grand jury who is subpoenaed, sworn to tell the truth, and obligated to answer on the pain of contempt, unless he invokes the privilege and shows that he faces a realistic threat of self-incrimination." *Id*. at 427. "The answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of the privilege." *Id.* The Court acknowledged that "[t]he threat of punishment for reliance on the privilege distinguishes cases of this sort from the ordinary case in which a witness is merely required to appear and give testimony." *Id.* at 435. "A State may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege." *Id.* "The result may be different if the questions put to a probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution. There is thus a substantial basis in our cases for

concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." *Id*.  The Court explained that "a state may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination." *Id.* at 435 n.7.

In finding that Murphy's incriminating statements were not compelled, the Court noted that his "probation condition proscribed only false statements; it said nothing about his freedom to decline to answer particular questions and certainly contained no suggestion that his probation was conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution." *Id.* at 437. The Court further found that "there is no reasonable basis for concluding that Minnesota attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination" and noted that there was "no direct evidence that Murphy confessed because he feared that his probation would be revoked if he remained silent." *Id.* "Unlike the police officers in *Garrity v. New Jersey*, 385 U.S. 493 (1967), Murphy was not expressly informed during the crucial meeting

22

with his probation officer that an assertion of the privilege would result in the imposition of a penalty." *Id.* The Court also found that even if Murphy subjectively believed "that his probation might be revoked for exercising the Fifth Amendment privilege, that belief would not have been reasonable" because "[o]ur decisions have made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." *Id.* In this case, in contrast to the facts of *Murphy*, Defendant twice refused to provide the iPhone passcodes to Jerram, and Jerram warned him that his refusal to do so could result in his arrest for a parole violation. Jerram then obtained a parole violation warrant based on Defendant's refusal to provide the passcodes and placed Defendant in custody. These facts raise the specter of compelled self-incrimination found lacking in *Murphy*.

The undersigned also finds instructive the case of *United States v. Singleton*, No. 1:09-CR-546-RWS-GGB, 2010 U.S. Dist. LEXIS 103527 (N.D. Ga. May 10, 2010), *adopted by* 2010 U.S. Dist. LEXIS 96346 (N.D. Ga. Sept. 14, 2010). In that case, the court suppressed incriminating documents the defendant produced to a United States Probation Officer after the probation officer repeatedly requested the documents and told the defendant "that if he did not provide the documents, that [the probation officer] would tell the court that Singleton had refused to submit them." *Id.* at *5-6. The court discussed *Murphy* and found that "[c]ertain

23

circumstances are present here that distinguish Singleton's case from that of defendant Murphy and bring Singleton's act of production of documents within the 'classic penalty situation' described by the Supreme Court." *Id.* at *14-15. "Most importantly, here, unlike the situation in *Murphy*, there was a genuine threat of revocation from the probation officer with respect to the production of documents," i.e., "[w]hen Perkins repeatedly told Singleton that he needed the documents in order to report to the court, and that he would tell the court if Singleton did not provide them, he strongly implied to Singleton that his probation would be revoked if he did not provide the requested documents." *Id.* at *15. The court also noted that the Court in *Murphy* "emphasized that defendant Murphy's probation proscribed only false statements; the condition did not address his freedom to decline to answer particular questions" while "Singleton's probation specifically required him to answer truthfully all inquiries by his probation officer and to provide his probation officer access to requested financial information." *Id.* at *17. Thus, the court found that "Singleton was facing the classic penalty situation in response to Perkins' persistent requests that he produce the incriminating documents[.]" *Id.* at *17-18.

Similarly, in *United States v. Saechao*, 418 F.3d 1073 (9th Cir. 2005), the court held that the defendant had been compelled to incriminate himself under threat of probation revocation where he "was instructed on two occasions that his

probation conditions required him, *inter alia*, to 'promptly and truthfully answer all reasonable inquiries' and the terms of his probation provided that a failure to comply could result in its revocation." *Id.* at 1081.  The court also noted that "the state did not advise him that 'it would not, [or] legally could not, revoke probation for refusing to answer questions calling for information that would incrimination in separate criminal proceedings.' " *Id.* (quoting *Murphy*, 465 U.S. at 438).

Here, Defendant's parole conditions required him to "truthfully answer all questions and follow all written and verbal instructions from my parole officer or any other employee of the State Board of Pardons and Paroles." (Doc. 297-21 at 5).  Moreover, Officer Jerram did more than "strongly imply" that Defendant's parole would be revoked if he did not provide the passcodes.  He warned Defendant that "failure to follow instructions from a parole officer could result in his arrest . . . for a violation of parole," he obtained a parole violation warrant based on Defendant's refusal to provide the passcodes, and he arrested Defendant pursuant to that warrant.  He also did not advise Defendant that his parole would not be revoked "for refusing to answer questions calling for information that would incriminate him in separate criminal proceedings." *Murphy*, 465 U.S. at 438. Thus Defendant faced the classic "penalty situation" described in *Murphy*, *Singleton*, and *Saechao*, and his compelled responses to Officer Jerram about his iPhone passcodes were obtained in violation of the Fifth Amendment. *See*

25

*Saechao*, 418 F.3d at 1077 (explaining that "[i]f an individual's refusal to answer incriminating questions subjects him to a penalty, then the Fifth Amendment is self-executing and any statements made under threat of such penalty are inadmissible").

The Government "concedes that the Court should grant Defendant's motion to suppress trial testimony that Defendant initially refused to provide the passcodes to his iPhones and that he later did provide the passcodes." (Doc. 322 at 2). Nevertheless, the Government contends that the Court should deny Defendant's motion to suppress evidence of information observed in the iPhones, including the phone number for the iPhone and drug-related matters observed in the iPhones, because Defendant voluntarily consented to the search of the iPhones by providing the passcodes. (*Id.* at 3). The undersigned disagrees.

"The exclusionary rule, which bars the admission of evidence obtained in violation of the Constitution, extends beyond the direct products of police misconduct to evidence derived from the illegal conduct, or 'fruit of the poisonous tree.' " *United States v. Terzado-Madruga*, 897 F.2d 1099, 1113 (11th Cir. 1990) (citing *Nardone v. United States*, 308 U.S. 338 (1939)). Although the cases which mark the origin and development of the 'fruit of the poisonous tree' doctrine involved violations of the Fourth Amendment guarantee against searches and seizures . . . , the doctrine also applies to the fruits of evidence obtained in

violation of an accused's Sixth Amendment right to counsel . . . as well as violations of the Fifth Amendment." *Id.* (citations omitted). "The taintedness test is not a hypothetical one of possibilities: 'but for' the unlawful acquisition of the direct evidence, the indirect evidence would not have been obtained. Instead, the test is an actual one: did in fact the government use the illegally acquired direct evidence to obtain the indirect evidence? Was in fact the causal connection between the indirect evidence that unlawful seizure of the direct evidence unavoidable?" *United States v. Massey*, 437 F. Supp. 843, 855 (M.D. Fla. 1977) (citing *inter alia Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

Here, Defendant's admission concerning his iPhone passwords resulted from a violation of his Fifth Amendment right against self-incrimination. The Government appears to concede as much as it concedes that the Court should suppress testimony that Defendant initially refused to provide his passcodes and then provided them. (Doc. 322 at 2-3). The agents then used the unlawfully obtained passcodes to search Defendant's iPhones and find incriminating evidence, i.e., an image file with instructions on how to set up a "trap house," texts relevant to drug activity, and a phone number associated with the wiretap investigation. (Tr. 38-39, 76-77, 79). The incriminating evidence found on the iPhones was thus tainted by the initial constitutional violation.

27

The undersigned rejects the Government's assertion that suppression of evidence found on the iPhones is not required because Defendant voluntarily consented to the search of the iPhones by providing the passcodes. (*See* Doc. 322 at 3-4).  The Government cites *United States v. Delancy*, 502 F.3d 1297 (11th Cir. 2007) for the proposition that even where a constitutional violation occurs, the Court must determine whether subsequently given "consent" was voluntary and "whether the voluntary consent was the product of the underlying illegality." (Doc. 322 at 3-4).  In *Delancy*, the court explained, "Under controlling law, we are required to conduct two separate inquiries where a consent to search follows prior illegal activity by the police.  First, a court must determine whether the consent was voluntary.  Second, the court must determine whether the consent, even if voluntary, requires exclusion of the evidence found during the search because it was the 'fruit of the poisonous tree'—the product of an illegal entry."  502 F.3d at 1308.  "This two step approach is mandatory, and the government bears the burden on both issues."  *Id.*; *see also United States v. Santa*, 236 F.3d 662, 676 (11th Cir. 2000) ("For consent given after an illegal seizure to be valid, the Government must prove two things: that the consent is voluntary, and that the consent was not a product of the illegal seizure.").  The Government has not proven that either of these requirements is met.

28

First, the Government has not shown that Defendant's purported "consent" to the search was voluntary. The Government cites *United States v. Watson*, 423 U.S. 411 (1976) to support its argument that Defendant voluntarily consented to the search of the iPhones, but the undersigned finds that case easily distinguishable from the facts present here. In that case, the Court noted the following:

> There was no overt act or threat of force against Watson proved or claimed. There were no promises made to him and no indication of more subtle forms of coercion that might flaw his judgment. He had been arrested and was in custody, but his consent was given while on a public street, not in the confines of the police station. Moreover, the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search. Similarly, under *Schneckloth*, the absence of proof that Watson knew he could withhold his consent, though it may be a factor in the overall judgment, is not to be given controlling significance. There is no indication that Watson was a newcomer to the law, mentally deficient, or unable in the face of custodial arrest to exercise a free choice. He was given Miranda warnings and was further cautioned that the results of the search of his car could be used against him. He persisted in his consent.

*Watson*, 423 U.S. at 424-25. Here, the circumstances surrounding Defendant giving Officer Jerram the passcodes undermines a finding that he did so voluntarily. He repeatedly refused to provide the passcodes, even after he was threatened with arrest if he continued to refuse, and he was then arrested and placed in handcuffs based on his refusal. Unlike the defendant in *Watson*, Defendant was not advised of his rights under *Miranda*, even after Officer Jerram arrested him. Only minutes after being arrested he provided the passcodes. Unlike

in *Watson*, it was Defendant's attempt to exercise his to remain silent that formed the basis for his arrest, thus indicating that he was "unable in the face of a custodial arrest to exercise a free choice." *Watson*, 423 U.S. at 425.

As to the second inquiry described in *Delancy*, the Government has not proven that Defendant's purported "consent," i.e., his providing the passcodes to Officer Jerram, was not "the product of the underlying illegality" as the Government contends. (Doc. 322 at 6). To the contrary, the undersigned finds that it was the product of compelled self-incrimination in violation of the Fifth Amendment. The court in *Delaney* explained that in evaluating whether a court should suppress as "fruit of the poisonous tree" evidence obtained through "the illegal actions of the police[,] . . . 'the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality of instead by means sufficiently distinguishable to be purged of the primary taint.' " *Delancy*, 502 F.3d at 1309 (quoting *Wong Sun*, 371 U.S. at 488). The court is "obliged to determine whether the consent was 'sufficiently an act of free will to purge the primary taint of the unlawful invasion,' or alternatively, whether the causal connection had 'become so attenuated as to dissipate the taint.' " *Id.* (quoting *Wong Sun*, 371 U.S. at 486-87). "This is a fact-specific question, and no single fact is dispositive." *Id.* Factors to be considered include, but are not limited to,

"the temporal proximity of the seizure and the consent," "the presence of intervening circumstances," and "the purpose and flagrancy of the official misconduct." *Id.* But the court should "not allow a factor-based analysis to obscure the underlying question, which 'generally involves a pragmatic evaluation of the extent to which the illegal police conduct caused the defendant's response.' " *Id.* at 1310 (quoting *United States v. Bailey*, 691 F.2d 1009, 1013 (11th Cir. 1982)).

The undersigned has considered these factors and undertaken a "pragmatic evaluation" of the evidence presented at the suppression hearing and finds that Defendant's decision to give Officer Jerram his iPhone passcodes, thus "consenting" to their search, was a product of compelled self-incrimination in violation of the Fifth Amendment. He was placed in the "classic penalty situation" described in *Murphy*, threatened with arrest if he did not provide the passcodes, and only provided them after he was arrested for failing to provide them. Thus, evidence obtained as a result of the search of the iPhones should be suppressed as fruit of the poisonous tree of the Fifth Amendment violation. The undersigned therefore **RECOMMENDS** that Defendant's motions to suppress any evidence, including statements made by Defendant be **GRANTED** to the extent he seeks to suppress evidence concerning his failure to provide the iPhone passcodes, his

31

subsequent provision of the passcodes, and information found on the passcode-protected iPhones on February 17, 2016 after Defendant provided the passcodes.[7]

### B.   **Defendant's Post-Arrest Statement About Nickname**

Defendant argues that his statements about his nickname should be suppressed because he was in custody when he made those statements, and he was asked about his nickname after he had invoked his rights under *Miranda*, i.e., not to talk to law enforcement without an attorney present.   (*See* Doc. 306 at 9-10; Doc. 316 at 10-11).   The evidence shows that after Defendant was arrested and brought to the GBI command center, Agent Bridges advised Defendant of his *Miranda* rights and Defendant declined to waive them, instead invoking his right to remain silent and for an attorney.   (Tr. 95, 97, 102; Gov't Exs. 11, 12).   Agent Abercrombie also completed a Georgia Bureau of Investigation Arrest Record form which asks for biographical information, including name, nickname, race, sex, address, employment information, and physical characteristics.   (Tr. 95-98; Gov't Exs. 10, 12).   In response to those questions, Defendant stated that his nickname was "Droopy," which Abercrombie included on the Arrest Record form, and Defendant signed that form.   (Gov't Exs. 10, 12).

---

[7]The undersigned notes that the Government did not argue that any other exceptions to the exclusionary rule, including the "inevitable discovery" doctrine or "independent source" doctrine, apply here.  *See Terzado-Madruga*, 897 F.2d at 1113-16 (discussing the requirements for those exceptions to the exclusionary rule).

"An officer's request for ' "routine" information for booking purposes is not an interrogation under *Miranda*, even though that information turns out to be incriminating.' " *United States v. Sweeting*, 933 F.2d 962, 965 (11th Cir. 1991) (quoting *United States v. Sims*, 719 F.2d 375, 378-79 (11th Cir. 1983)).  "Under the routine booking exception, routine booking questions regarding a Defendant's age, height, weight, eye color, name, and current address are 'reasonably related to the police's administrative concerns,' and therefore exempt from *Miranda*'s reach." *United States v. Walton*, No. 1:12-CR-00395-CAP-LTW, 2014 U.S. Dist. LEXIS 96749, at *45 (N.D. Ga. June 11, 2014) (quoting *Pa. v. Muniz*, 496 U.S. 582, 601 (1990)), *adopted by* 2014 U.S. Dist. LEXIS 95811 (N.D. Ga. July 15, 2014).  "However, questions that are reasonably likely to elicit an incriminating response may breach this booking exception." *Id.* at *45-46 (citing *United States v. Corey*, 861 F. Supp. 2d 1341, 1344 (S.D. Fla. 2012)).

Here, no evidence was presented that Agent Abercrombie asked Defendant about his nickname for any reason other than to complete the Arrest Record form, which includes a field for "nickname." (*See* Gov't Ex. 10).  *Cf United States v. Ramirez*, 991 F. Supp. 2d 1258, 1266 (S.D. Fla. Jan. 10, 2014) (finding that question about how long the defendant had lived at his address was not a routine booking question where, among other things, neither the offense-incident report or background information section of the official report requested that information).

Agent Ambercrombie was not involved in the underlying drug investigation and did not know the significance of Defendant's nickname to that investigation. (Tr. 90-92). Accordingly, the undersigned finds that Agent Abercrombie's questioning of Defendant was for the purpose of asking routine booking questions—not for eliciting an incriminating response—and therefore not an interrogation under *Miranda*. *See, e.g. Sweeting*, 933 F.2d at 965 (finding that "no evidence was presented that Douglas' reason for asking Joseph his address was other than to secure routine booking information"); *United States v. Brown*, No. 07-1341-cr, 2008 U.S. App. LEXIS 22502, at *7-8 (2d Cir. Oct. 14, 2008) (finding no violation of *Miranda* rights where "defendant was asked a series of questions from a standard police booking form, including whether she had any nicknames or aliases," and she provided a nickname; "the fact that her answer was useful for investigatory as well as booking purposes does not render her answer inadmissible"); *Walton*, 2014 U.S. Dist. LEXIS96749, at *46 (finding that questioning the defendant about his gang affiliation fell into routine booking exception to *Miranda*).

The recording of the agents' interview with Defendant shows that Abercrombie asked Defendant for his nickname before Defendant was read his rights and invoked his rights to remain silent and for an attorney, and she continued to ask Defendant for information to complete the Arrest Record form after he

34

invoked his rights.  (*See* Gov't Ex. 12).  But even if Defendant had already invoked his rights under *Miranda* when Agent Abercrombie asked him about his nickname, that fact would not show that Defendant's rights were violated.  *See, e.g.*, *United States v. Muhammad*, 196 Fed. Appx. 882, 885-86 (11th Cir. 2006) (unpublished decision) (finding that the defendant's invocation of his right to remain silent "was scrupulously honored by the government" even though the inspector "asked for some biographical information after the interrogation" because "these questions did not constitute a recommencement of formal interrogation, since an officer's request for routine information for booking purposes is not considered to be an 'interrogation' under *Miranda*"); *United States v. Lincoln*, No. 1:12-CR-42-ODE-JFK, 2012 U.S. Dist. LEXIS 142836, at *23-25 (N.D. Ga. Oct. 2, 2012) (denying motion to suppress statements made in response to routine booking questions asked after defendant invoked right to counsel because such questions were not an interrogation for purposes of *Miranda*); *cf United States v. Philpot*, No. 1:15-CR-028-WSD-LTW, 2016 U.S. Dist. LEXIS 183882, at *28 (N.D. Ga. June 3, 2016) (finding that "all statements (*other than statements made in response to routine biographical questions*) made after Reese invoked his right to remain silent, are inadmissible and should be suppressed" (emphasis added)).

Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress evidence of his post-arrest statements concerning his nickname be **DENIED**.

## Summary

For the foregoing reasons, it is **RECOMMENDED** that Defendant's Motion To Suppress Evidence And Motion In Limine (Doc. 80) and his Motion To Suppress Statements (Doc. 88) be **GRANTED in part and DENIED in part**. Specifically, it is **RECOMMENDED** that Defendant's motion to suppress statements about his iPhone passcodes and evidence found on his iPhones on February 17, 2016 after he provided his passcodes be **GRANTED**. It is further **RECOMMENDED** that Defendant's motion to suppress other evidence and statements, including evidence obtained as the result of the warrantless search of his car and non-passcode protected cellphones on February 17, 2016 and his post-arrest statements about his nickname, be **DENIED**.

**IT IS SO REPORTED AND RECOMMENDED** this 11th day of July, 2018.

/s/ J. Clay Fuller
J. Clay Fuller
United States Magistrate Judge